IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs at Knoxville December 17, 2019

## STATE OF TENNESSEE v. JUAN RAMON CHAVES-ABREGO[1]

**Appeal from the Circuit Court for Maury County**
**No. 24889     Stella L. Hargrove, Judge**

_____

### No. M2018-01880-CCA-R3-CD

_____

A Maury County Circuit Court Jury convicted the Appellant, Juan Ramon Chaves-Abrego, of rape of a child, a Class A felony, and the trial court sentenced him to thirty years to be served at one hundred percent. On appeal, the Appellant contends that the evidence is insufficient to support the conviction, that the admission of the victim's forensic interview into evidence violated his right to confrontation, that the trial court erred by allowing proof of other bad acts, that cumulative error requires reversal of his conviction, and that his sentence is excessive. Based upon the record and the parties' briefs, we conclude that the evidence is sufficient to support the conviction, that the Appellant's sentence is not excessive, and that his remaining issues have been waived because his motion for new trial was untimely. Accordingly, we affirm the judgment of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ALAN E. GLENN, JJ., joined.

John M. Schweri (on appeal) and Douglas K. Chapman (at trial), Columbia, Tennessee, for the appellant, Juan Ramon Chaves-Abrego.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Brent A. Cooper, District Attorney General; and Emily C. Hartman and Daniel Runde, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION

_____

[1] We note that throughout the record, the Appellant's last name appears as "Chavez-Abrego," "Chaves-Abrego," and "Abrego-Chavez." However, we have chosen to use his last name as it appears in the indictment, "Chaves-Abrego."

## I. Factual Background

Officer Darien Nagel of the Columbia Police Department (CPD) testified at trial that on February 17, 2016, he was dispatched to American Mobile Village, which he described as a "trailer park." He went to a single-wide mobile home on lot seventy-four and spoke with the victim's mother, who told him about allegations of sexual abuse involving the six-year-old victim. The victim's mother named the Appellant as the perpetrator and said he lived in a mobile home on lot sixty-five. Officer Nagel stated that about one hundred mobile homes were in the trailer park and that lot seventy-four was only "a few trailers away" from lot sixty-five. He collected information for his report and gave the information to a detective in the police department's Special Victim's Unit (SVU). He also filed a report with the Department of Child Services (DCS). Officer Nagel did not talk with the Appellant.

On cross-examination, Officer Nagel testified that according to his report, the victim's mother first asked the victim about "the situation." The victim told her mother about the abuse, and the victim's mother asked the victim, "[W]as it Mr. Abrego[?]" On redirect examination, Officer Nagel acknowledged that he did not know whether the victim's mother said the Appellant's name first or whether the victim said the Appellant's name first.

Corporal Michael Richmond of the CPD testified that in February 2016, he was a detective in the SVU and began investigating the victim's allegations. During a forensic interview, the victim alleged digital penetration by the Appellant. Corporal Richmond watched a recording of the interview and tried to contact the Appellant and Holly Grant, the Appellant's live-in girlfriend. Corporal Richmond was able to contact Grant, but he was unable to contact the Appellant. On cross-examination, Corporal Richmond testified that there was "quite a bit of time [lapse]" between the incident and the allegations; therefore, no forensic physical evidence was collected.

Lori Littrell testified that she was a certified nurse practitioner at Our Kids Center in Nashville and that a forensic medical evaluation was conducted on the victim on February 22, 2016, due to "concerns of digital genital contact by an adult male." As part of the evaluation, Jill Howlett, a social worker, "teamed" with Littrell and collected information from the victim about her medical history. Littrell said that according to the history, the victim told Howlett, "'[S]omeone molested me.'" Howlett asked what the victim meant by "molested," and the victim said that "'he touched me on my private spot'" and pointed to her genital area. When asked who touched her, the victim answered, "'Alfredo, [my friend's] mom's boyfriend.'" The victim said that he touched her with "'his hand and his fingers'" and that he touched her "'on my skin. He pulled my

pants out and touched it.'"  Howlett asked if Alfredo's hand and fingers went inside or stayed outside her private spot, and the victim said, "'[O]n the inside.'"  The victim said that the abuse happened "more than one time.  It was every day I went there[.]'"  Howlett asked if Alfredo touched the victim "in any other way," and the victim said no.

Littrell testified that she performed a physical examination of the victim and that the victim's exam was "normal," meaning that Littrell did not see any signs of injury or infection to the victim's anal area or genitals.  Littrell stated that "[t]he vast majority of children who are evaluated for child sexual abuse have normal anal/genital exams."  She explained that most examinations were normal because "some types of contact just don't cause injury" and because "private parts can heal really, really quickly, within a matter of just a few days."  She then stated as follows:

> Another reason that we know why most kids have normal anal/genital exams is just how they sort of understand or are able to describe inside.  One of the questions that we ask a lot of girls when we are getting medical histories is when you use the bathroom, after you urinate and you wipe, are you wiping on the inside or the outside or both.  And the majority of girls that we see say either inside or both.  And I don't think most of these girls are fully wiping inside of their vaginal canals when they are going to the bathroom.  So that just sort of helps us understand.  Kids describe anything that is inside of the labia, or the lips of the private parts, as inside.  They can't necessarily differentiate vaginal penetration versus genital penetration.  And with genital penetration, you are just not going to expect to see injury most of the time.

Littrell acknowledged that the victim was "able to clearly articulate" that the Appellant touched her on the inside.

On cross-examination, Littrell testified that victim's use of the word "molested" was "something that I don't hear commonly" but that "it's not completely unusual."  She acknowledged that according to a study, children who alleged sexual penetration were twelve and one-half times more likely to show some type of injury; however, the victim did not have any injury.  On redirect examination, Littrell testified that hundreds of children were examined at Our Kids every year and that "we see injury in seven percent."

Cindy Powell testified that she was a forensic interviewer at Kid's Place, a child advocacy center.  On February 24, 2016, Powell interviewed the victim about allegations of sexual abuse.  Powell said she asked the victim non-leading questions throughout the interview so as not to lead the victim into any answers.

The State played a video recording interview for the jury, and we have reviewed the video. The victim told Powell that she was six years old and that she lived with her mother, father, older brother, and younger brother. Powell asked the victim, "Why are you here today?" The victim said that her friend's "dad put his hand in my private spot, inside" and that his name was "Alfredo." Powell asked if the incident happened one time or more than one time, and the victim said more than one time. The victim said she was five or six years old when the abuse occurred.

The victim told Powell about two incidents. The victim said that one incident occurred in the living room of her friend's house and that "the big snow was happening." The victim stated that she and her friend were "running around the table" and that Alfredo "was on the couch." The victim said that Alfredo "grabbed me" and that he "stuck his hand in my private spot." The victim was wearing a short-sleeved shirt, pants, and panties, and his hand went inside her panties. Powell said, "Tell me what his hand did when it touched your private spot." The victim answered, "Squeezed it." Powell asked how the victim knew Alfredo's hand was inside her private spot, and the victim said she felt it. The victim said that after the incident, Alfredo "went back to the couch."

Powell asked the victim, "Did it happen somewhere else at his house?" The victim responded that it happened one time in her friend's bedroom. The victim explained that she and her friend were pretending to be asleep, that Alfredo came into the bedroom, and that he "put his hand under the cover." The victim said that Alfredo "put his hand in my cookie" and that she and her mother sometimes called her private part her "cookie." The victim also said that Alfredo "put his hand under the blanket and squeezed my private spot." The victim was wearing a short-sleeved shirt, a skirt, shorts under the skirt, and panties under the shorts, and Alfredo's hand went inside her panties. Powell asked if Alfredo had "done this to anyone else," and the victim answered, "Yes, he did it to his own daughter." Powell asked how the victim knew that, and the victim answered, "She told me."

On cross-examination, Powell acknowledged that some of her questions to the victim could have been interpreted as leading. Powell also acknowledged that the victim said several times that "'he squeezed it,'" which was different than saying he put his hand inside. The victim demonstrated for Powell what she meant by "he squeezed it," but her hand was under the table during the demonstration. Therefore, her demonstration was not visible on the video. On redirect examination, Powell explained that during the victim's demonstration, the victim "grabbed like at her shorts, pulled them out and said that the hand went in." Powell said the victim did not use her fingers during the demonstration. On recross-examination, Powell testified, "I do remember asking her if when he touched if it was on the outside or the inside and she did say that it was on the inside and that she knew it was on the inside because she could feel it."

- 4 -

The victim's mother testified that the victim was born on December 3, 2009, and that the victim was "very truthful." In January 2016, the victim was six years old, and her family lived in the same trailer park as the Appellant. The Appellant lived with "Holly"; his stepdaughter, who was the same age as the victim; and his son. The Appellant's stepdaughter and the victim were friends and would go to each other's houses to play. The Appellant was known as "Alfredo," and the victim referred to him as "Alfredo."

The victim's mother testified that she "didn't notice anything different" about the victim in the fall of 2015. In January 2016, though, the victim's mother noticed that the victim no longer wanted to play with the Appellant's stepdaughter. The victim's mother said that "the snow had come, because they were out of school" and that the Appellant's stepdaughter wanted the victim to come to her home to play during the snowstorm. However, the victim did not want to go there. The victim's mother asked why the victim did not want to go to the Appellant's house to play, and the victim said she wanted to stay home and play. The victim's mother identified a January 24, 2016 newspaper article that stated schools were closed due to snow.

The victim's mother testified that on February 16, she received information that caused her to ask the victim if anyone had ever touched the victim inappropriately. The victim's mother said that she did not name the Appellant and that "I've worked in child care for most of my life and I know how to deal with these types of situations. You do not use names." The victim's mother stated that the victim "broke down" and started crying and that the victim said "Alfredo" had put his hands inside her "cookie," meaning her private part. The victim's mother telephoned the police, and the victim was evaluated at Our Kids Center. The staff at Our Kids recommended that the victim receive counseling, so the victim attended counseling at Kid's Place.

The victim's mother recounted that "there also was an incident" in which the victim went to spend the night with the Appellant's stepdaughter at the Appellant's home. The victim's mother said that the Appellant and Holly brought the victim home "in the middle of the night" and that the victim was crying. The victim never told her mother why she was crying.

On cross-examination, the victim's mother testified that the incident in the middle of the night occurred before the snowstorm. She said she did not mention the Appellant's name to the victim when she was questioning the victim. Defense counsel asked about the victim's truthfulness, and the victim's mother said the victim "has told little tales but never tall tales before."

At the close of the victim's mother's testimony, the State rested its case and elected to proceed on the incident that occurred in the Appellant's stepdaughter's bedroom as opposed to the incident in the living room. The Appellant did not present any proof, and the jury convicted him as charged of rape of a child, a Class A felony. After a sentencing hearing, the trial court sentenced him as a Range II offender to thirty years to be served at one hundred percent.

## II. Analysis

On appeal, the Appellant contends that the evidence is insufficient to support the conviction, that the admission of the victim's forensic interview into evidence violated his right to confrontation, that the trial court erred by allowing proof of other bad acts, that cumulative error requires reversal of his conviction, and that his sentence is excessive. The State argues that the Appellant's motion for new trial was untimely and, therefore, results in a waiver of all issues except those relating to the sufficiency of the evidence and sentencing. We agree with the State.

A motion for new trial must be made in writing or reduced to writing within thirty days of the "date the order of sentence is entered." Tenn. R. Crim. P. 33(b). This provision is mandatory, and the time for the filing cannot be extended. Tenn. R. Crim. P. 45(b); State v. Martin, 940 S.W.2d 567, 569 (Tenn. 1997). Because a trial court does not have jurisdiction to hear and determine the merits of an untimely motion for new trial, the trial court's "erroneous consideration [and] ruling on a motion for new trial not timely filed . . . does not validate the motion." Martin, 940 S.W.2d at 569 (citing State v. Dodson, 780 S.W.2d 778, 780 (Tenn. Crim. App. 1989)). "If a motion for new trial is not timely filed, all [the appellant's] issues are deemed waived except for sufficiency of evidence and sentencing." State v. Bough, 152 S.W.3d 453, 460 (Tenn. 2004) (citing Tenn. R. App. P. 3(e)). Moreover, the untimely filing of a motion for new trial does not toll the time for filing a notice of appeal. Therefore, an untimely motion for new trial often will also result in an untimely notice of appeal. State v. Davis, 748 S.W.2d 206, 207 (Tenn. Crim. App. 1987).

The sentencing hearing in this case was held on June 22, 2018, and the judgment of conviction was entered that same day. More than three months later, on September 28, 2018, the Appellant filed a motion for new trial in which he claimed that the trial court erred by allowing the State to play the victim's forensic interview for the jury "when the victim was available and sat with the State through the entire trial"; that the evidence was insufficient to support the conviction; and that cumulative error deprived him of a fair trial. The trial court held a hearing on the motion the same day the motion was filed. At the conclusion of the hearing, the trial court denied the motion for new trial. The trial

court also filed a written order on September 28, 2018, denying the motion. On October 12, 2018, the Appellant filed a notice of appeal.

The Appellant's motion for new trial was filed well-beyond the thirty-day time limit mandated by Tennessee Rule of Criminal Procedure 33(b). As a result, the Appellant's notice of appeal also was untimely. "[I]n all criminal cases the 'notice of appeal' document is not jurisdictional and the filing of such document may be waived in the interest of justice." Tenn. R. Crim. P. 4(a). In the interests of justice, we have decided to waive the timely filing of the notice of appeal in this case. However, because the Appellant's motion for new trial was untimely, he has waived his issues except sufficiency of the evidence and sentencing.

We note that the Appellant did not address his late-filed motion for new trial or notice of appeal in his brief and that he did not submit a reply brief to respond to the State's waiver argument. We further note that although the record reflects that the trial court held a pretrial hearing on the admissibility of the victim's forensic interview, the Appellant failed to include a transcript of the hearing in the appellate record and did not seek to supplement the record with the transcript. See Tenn. R. App. P. 24(b) (providing that it is the appellant's duty to prepare a fair, accurate, and complete record on appeal to enable this court to conduct a meaningful review). Therefore, we are precluded from reviewing the waived issues for plain error.

A. Sufficiency of the Evidence

The Appellant claims that the evidence is insufficient to support his conviction of rape of a child because although the victim talked about "'inside,'" she also talked about "'squeezing it.'" The Appellant further claims that the evidence is insufficient because one of the State's own witnesses testified that "children had difficulty verbalizing whether penetration had occurred or not" and because there was no physical evidence of penetration. The State claims that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or

reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting Marable v. State, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

As charged in this case, rape of a child is the unlawful sexual penetration of a victim by a defendant if the victim is more than three years old but less than thirteen years old. Tenn. Code Ann. § 39-13-522(a). "'Sexual penetration' means sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required[.]" Tenn. Code Ann. § 39-13-501(7).

Here, the victim told Cindy Powell during her forensic interview that the Appellant came into her friend's bedroom, that he put his hand inside the victim's panties, and that he "put his hand in my cookie." The victim explained that she and her mother called her private spot her "cookie." Although the victim also said that the Appellant "squeezed" her private spot, she specifically said that he put his hand "in" her private spot. Earlier in the interview, Powell asked how the victim knew the Appellant put his hand inside her private spot, and the victim said she felt it. During closing arguments, defense counsel argued to the jury that the victim said the Appellant "squeezed" her private spot, which was different than saying he put his hand "inside" her private spot. Defense counsel also recalled Lori Littrell's testimony that many children, particularly girls, did not understand the difference between the inside and the outside of their genetalia and that there was no physical evidence of penetration. By its verdict, the jury obviously accredited the victim's testimony that the Appellant vaginally penetrated her. Taken in the light most favorable to the State, we conclude that the evidence is sufficient to support the conviction.

## B. Sentencing

The Appellant contends that his thirty-year sentence is excessive and effectively equates to a sentence of life without parole because he is fifty-seven years old and HIV positive. He also asserts that the sentence is "unjustifiably disparate" when compared to other defendants convicted of rape of a child. The State argues that the Appellant's thirty-year sentence is presumptively reasonable and that the Appellant has not overcome the presumption. We agree with the State.

At the Appellant's sentencing hearing, Amanda Philyaw testified that she was the investigating officer who prepared the Appellant's presentence report. The Appellant filled out a personal questionnaire for the report, and Philyaw met with him to discuss the questionnaire. According to the Appellant, he was born in Guatemala, served in the military, and moved to the United States in 2002. The Appellant had "grown" children in Guatemala, and he had children in the United States. In 2005, the Appellant was diagnosed as HIV positive. He told Philyaw that he was a landscaper and that he worked "on the Greenway." However, Philyaw was unable to verify his employment. The Appellant also told Philyaw that he had lived in Texas; Miami, Florida; and New York, but she was unable to verify any addresses for him.

Philyaw testified that the Appellant denied the victim's accusations and that he claimed as follows: The victim stayed three nights at the Appellant's residence. One night at 10:30 p.m., the victim started crying and wanted to go home. The victim's mother picked up the victim and told the Appellant that the victim "normally woke up crying." On another occasion when the victim was spending the night, the Appellant took the victim home because she was crying. After that incident, the victim told her mother that the Appellant was molesting her. Although the victim claimed she did not return to the Appellant's home, the victim and her mother attended a birthday party at the Appellant's residence two weeks later.

Philyaw described the Appellant as "kind of off-standish" and "shy." The Appellant told Philyaw that he thought he was being prosecuted because he was Hispanic and because "it is what the general population wants." Philyaw said that the Appellant compared his case to Jesus in that "Jesus was persecuted because that was what the general population wanted."

On cross-examination, Philyaw testified that she initially left a Spanish version of the questionnaire at the jail for the Appellant. On February 20, 2018, she returned to the jail and met with him. Philyaw took an English version of the questionnaire to the meeting, and she and a translator "kind of matched" the two questionnaires. Philyaw acknowledged that the process she used to prepare the Appellant's presentence report was

"more difficult" than preparing a regular presentence report but said that she thought the Appellant's presentence report was accurate. Philyaw did not find a prior criminal history for the Appellant, and his Strong-R report assessed his likelihood to reoffend as low. Philyaw said that the Appellant "seemed grateful" she met with him and that he thanked her for her time.

The victim's mother testified that she allowed the victim to play at the Appellant's home and that she trusted the Appellant to protect the victim. The victim spent one night at the Appellant's residence but came home "in the middle of the night crying." The victim's mother said that the Appellant's actions had affected her entire family, that she no longer trusted anyone, and that she no longer allowed her children to play at their friends' houses. She stated that her children "cannot lead a normal life because of this man" and that she wanted him "to be put away" so that he could not harm another child.

The State introduced the Appellant's presentence report into evidence. In addition to the information provided during Philyaw's testimony, the report showed that the Appellant was fifty-seven years old and married. In the report, the Appellant described his physical and mental health as "excellent" and said that he had never consumed alcohol or drugs. According to the report, Philyaw verified through the jail that the Appellant was HIV positive.

During the hearing, the trial court noted that the Appellant was facing a sentence of twenty-five to forty years as a Range II offender.[2] See Tenn. Code Ann. § 40-35-112(b)(1). The trial court asked the State, "Even though he is sentenced as Range II, it is a hundred percent, correct?" The State answered, "Yes, Your Honor. Well, . . . I guess technically there is that 15 percent that he could be entitled to." The trial court responded, "Yes, with a 15 percent RED release out there that could or could not happen so we have to say a hundred percent."

The trial court stated that it had considered the evidence presented at trial and sentencing, the presentence report, the general principles of sentencing, the nature and characteristics of the criminal conduct involved, enhancement and mitigating factors, statistical information from the Administrative Office of the Courts, and the Appellant's potential for rehabilitation or treatment. The trial court found that based on the record and the victim's mother's testimony, the Appellant "stood in a relationship to the victim, one that promoted confidence, reliability or faith." Therefore, the trial court applied enhancement factor (14), that the defendant abused a position of public or private trust, to the Appellant's sentence. See Tenn. Code Ann. § 40-35-114(14). Moreover, the court

---

[2] The statute for rape of a child mandated that the Appellant be sentenced as a Range II offender. See Tenn. Code Ann. § 39-13-522(b)(2)(A).

placed "substantial" weight on the factor. The trial court said that it had "absolutely no confidence" in the Appellant's Strong-R report because "every person I have sentenced has a low rating of reoffending." The trial court then noted that the Appellant had additional charges involving additional victims pending against him and that the abuse in this case "went on for some time." The trial court found that although the need for deterrence mostly applied to a consideration for probation, deterrence was needed in this case to provide an effective deterrent to those likely to commit similar offenses. The trial court also found that the Appellant's potential for rehabilitation was poor due to his refusal to accept responsibility for the crime. The trial court stated that it was imposing "a sentence of 30 years to serve at 100 percent. TDOC will determine any 15 percent eligibility for good time. The sentence is 30 years at a hundred percent."

This court reviews the length, range, and manner of service of a sentence imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In determining a defendant's sentence, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the defendant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also Bise, 380 S.W.3d at 697-98. The burden is on the Appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sent'g Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

Although the trial court should consider enhancement and mitigating factors, the statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; see also Bise, 380 S.W.3d at 701; State v. Carter, 254 S.W.3d 335, 343 (Tenn. 2008). Our supreme court has stated that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343 (quoting Tenn. Code Ann. § 40-35-210(d)). Appellate courts are "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act." Id. at 346.

Initially, we note that the Appellant claims we should review his sentence de novo because the need for deterrence should be considered in determining alternative sentencing, not the length of the sentence, and because the trial court mistakenly thought he was eligible for a fifteen percent reduction of his sentence. We disagree with the Appellant. This court has stated that "deterrence was a legitimate factor to consider" in determining the length of a sentence. State v. Mynatt, 684 S.W.2d 103, 104 (Tenn. Crim. App. 1984). Additionally, regarding the percentage of the sentence to serve, the trial court stated as follows:

> And now we know that we must sentence as a Range II, 25 to 40 years. The Court is going to impose a sentence of 30 years to serve at 100 percent. TDOC will determine any 15 percent eligibility for good time. The sentence is 30 years at a hundred percent.

In our view, the trial court was saying that it was not sure if the Appellant was eligible to receive sentence reduction credits of up to fifteen percent and that the TDOC would make that determination but that, regardless, the trial court was imposing a sentence of thirty years at one hundred percent. Therefore, we will review the Appellant's sentence under an abuse of discretion standard with a presumption of reasonableness.

In claiming that his sentence is unjustifiably disparate, the Appellant cites to statistical information provided on the Administrative Office of the Courts website and states that he was sentenced above the median for both standard offenders and all offenders convicted of rape of a child. We have reviewed the statistical information cited by the Appellant. While the median sentence for both standard offenders and all offenders convicted of rape of a child was 300 months in 2017 to 2018, the mean sentence for those two groups was 297.74 and 354.42 months, respectively. See http://www.tncourts.gov/sites/default/files/docs/tdoc_fall2018_stats.pdf. The Appellant's

- 12 -

360-month sentence is less than six months above the mean sentence for all offenders convicted of rape of a child. In our view, the six-month disparity is not excessive.

The Appellant does not contest the trial court's applicability of enhancement factor (14) or the trial court's conclusion that he lacked potential for rehabilitation or treatment. The Appellant's sentence was within the range of punishment for a Range II offender convicted of a Class A felony and was presumptively reasonable. We agree with the State that the Appellant has not overcome the presumption.

### III.  Conclusion

Based upon the record and the parties' briefs, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE